UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

**UNITED STATES OF AMERICA**

v.

**MYSON PEEPLES**

Crim. No. 16-463 (KM)

**OPINION & ORDER**

**MCNULTY, District Judge**

Now before the Court is the motion of Myson Peeples, a federal prisoner, for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). He contends that the reality or likelihood of COVID-19 infection while he is incarcerated, in combination with his health condition, constitutes an extraordinary and compelling set of circumstances that justifies his immediate release. For the reasons stated herein, that motion will be denied.

The defendant, Mr. Peeples, pled guilty on May 24, 2017, to one count of possession of a firearm by a convicted felon, 18 U.S.C. § 922(g)(1), and one count of possession with intent to distribute heroin, 21 U.S.C. §§ 841(a)(1) & (b)(1)(C).[1] The Court sentenced him to, *inter alia,* 151 months' imprisonment, representing the bottom of the Guideline range corresponding to the parties' agreed offense level of 29 and a Criminal History category of VI. He is currently serving that sentence of imprisonment at FCI Fort Dix.

Mr. Peeples petitioned the warden for release, citing COVID-19 "Long Haul Syndrome." On October 7, 2021, the warden denied that request. (DE 36-

---

[1] A third count, use of a firearm in furtherance of a drug transaction, 18 U.S.C. § 924(c), which carries a mandatory consecutive sentence, was dismissed as part of the plea bargain.

1)[2] On January 21, 2022, Mr. Peeples filed the motion for compassionate release that is now before the court. (DE 36. The motion is dated January 10, 2022.)[3] The United States filed a letter brief in response (DE 37), along with a copy of Mr. Peeples's prison medical records (DE 37-1; pages therein cited as "G __"). Mr. Peeples filed a reply. (DE 38). At the Court's request, the United States recently filed updated medical records for 2022. (DE 39-1; pages therein cited as "G2 __").

### I.    LEGAL STANDARDS

Once a term of imprisonment has been imposed, the Court may modify it only under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). As relevant here, § 3582(c)(1) provides as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
> (i) extraordinary and compelling reasons warrant

---

[2]    Section 3582(c) provides that a court may modify a term of imprisonment only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." The government acknowledges that the exhaustion requirement is met here.

[3]    The motion is ably argued *pro se*. The Federal Public Defender's office declined representation because it did not meet their guidelines. I attach no legal significance to that declination.

> such a reduction; [. . .]
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See also United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020). The United States Sentencing Commission has promulgated a policy statement that, in relevant part, allows a court to grant compassionate release or a sentence reduction where: (i) extraordinary and compelling reasons warrant a reduction in a defendant's sentence; (ii) the defendant is not a danger to the safety of others or to the community; and (iii) release from custody complies with the § 3553(a) factors, to the extent applicable. U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 1B1.13 (U.S. SENTENCING COMM'N 2018).

The policy statement of the Sentencing Commission defines certain circumstances that qualify as extraordinary and compelling. U.S.S.G. § 1B1.13, Application Note 1(A)–(D). That application note lists three specific circumstances that the Bureau of Prisons ("BOP") may find extraordinary and compelling, which I summarize:

a) a terminal illness or a serious medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover;

b) the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less; or

c) certain family circumstances exist where the defendant would be the only available caregiver for his or her minor child, spouse, or registered partner.

U.S.S.G. § 1B1.13, Application Note 1(A)–(C). In addition, the application note includes a catchall provision, which provides that "other reasons" may be sufficient if "[a]s determined by the Director of the [BOP], there exists in the

3

defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in [the enumerated] subdivisions." *Id.*, Application Note 1(D).

That policy statement was enacted at a time when only the BOP could consider an application for compassionate release, however, and has not been amended since the enactment of the First Step Act conferred certain additional powers on the courts. In prior cases, I accepted the emerging near-consensus that where a defendant makes a motion under the First Step Act, the court is not bound by the application note. The U.S. Court of Appeals for the Third Circuit, in a precedential decision, has now joined that consensus:

> The first issue is whether the District Court was bound by the Commission's policy statement. We conclude that it was not.
>
> As the District Court noted, the text of the policy statement explicitly limits its application to Bureau-initiated motions. Thus, according to its plain language, the existing policy statement is not applicable—and not binding—for courts considering prisoner-initiated motions. In reaching this conclusion, we align with nearly every circuit court to consider the issue. *See United States v. Brooker*, 976 F.3d 228, 235 (2d Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 282 (4th Cir. 2020); *United States v. Shkambi*, 993 F.3d 388, 393 (5th Cir. 2021); *United States v. Elias*, 984 F.3d 516, 519–20 (6th Cir. 2021); *United States v. Gunn*, 980 F.3d 1178, 1180–81 (7th Cir. 2020); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. McGee*, 992 F.3d 1035, 1050 (10th Cir. 2021); *United States v. Long*, 997 F.3d 342, 355 (D.C. Cir. 2021). *But see United States v. Bryant*, 996 F.3d 1243, 1247–48 (11th Cir. 2021).

*United States v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021).

Thus the Guidelines policy statement, designed to channel BOP discretion, does not limit what this Court may reasonably find to be "extraordinary and compelling." Still, it remains a relevant and valuable guide, and is properly considered by a district court:

> The [district] court correctly recognized that although the policy statement is no longer binding, it still sheds light on the meaning of extraordinary and compelling reasons. "It is a

4

commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'" *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, ⎯⎯ U.S. ⎯⎯, 139 S. Ct. 1881, 1890, 204 L.Ed.2d 165 (2019) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013)). Because Congress reenacted the compassionate-release statute without any alterations to the phrase "extraordinary and compelling reasons," it was reasonable for the court to conclude that the phrase largely retained the meaning it had under the previous version of the statute. *See United States v. Johnman*, 948 F.3d 612, 619 (3d Cir. 2020) . . . .

*Andrews*, 12 F.4th at 260.

I therefore am guided by the policy statement, but consider the grounds asserted by the defendant, whether or not specifically authorized by the policy statement. In particular, I consider whether the grounds cited here rise to the level of extraordinary and compelling circumstances, and, if so, whether the purposes of sentencing would nevertheless be unduly undermined if defendant were released.

## II. DISCUSSION

### A. Extraordinary and compelling circumstances

Mr. Peeples's First Step Act application for reduction of sentence rests primarily on the danger to his health from COVID-19 in the institutional setting of FCI Fort Dix. He states that he suffers from "Long Haul Syndrome," *i.e.,* ongoing effects of a COVID-19 infection. Obesity is identified as a potential aggravating condition.

I emphasize what is sometimes obscured in discussions of such First Step Act applications: A federal prisoner may suffer from ailments that would plague a person whether in or out of prison. One must ask whether there is something about *incarceration* that so *increases* the consequences to the prisoner as to set forth extraordinary and compelling circumstances. I therefore consider (1) Mr. Peeples's claimed "Long Haul" COVID-19 infection; (2) the risk, for someone with his medical conditions, that a COVID-19 infection would carry serious consequences; (3) the effect of COVID-19 vaccination on the

5

foregoing; and (4) COVID-19 infection rates at FCI-Fort Dix.

### 1. COVID-19 "Long Haul" Syndrome

Mr. Peeples claims to be suffering from "Long Haul Syndrome," including shortness of breath, as a result of a prior COVID-19 infection. This complaint I discount, as it is a self-diagnosis at odds with the medical evidence.

The government has submitted Mr. Peeples's prison medical records (G, G2). These demonstrate that he has received regular, thorough, and conscientious medical care, with even fairly minor complaints duly noted. If there were a COVID-19 infection, or even a claimed COVID-19 infection, it would surely appear in the records. It does not.

Consider, for example, the record of a clinical visit (apparently a routine physical exam) on October 1, 2021. (G 3-8.) The treatment notes reflect a thorough interview in which Mr. Peeples's complaints and their history were discussed in detail. Complaint 1 (orthopedic/rheumatology) included a history of substance abuse, chronic lower back pain from an injury, followed by a gunshot wound, with additional chest pain, a history of smoking, and hyperlipidemia (HDL 40, LDL 136). Complaint 2 (general) continued to note reported blurry vision, good compliance with medications, weight gain to 238 pounds, and a full workup of vital signs, which are largely normal.[4] Other findings, system by system, are largely unremarkable. (G 5–6) He is prescribed fluoxetine for lower back pain. (G 3-5) He receives a complete examination, including blood work, and eleven days later, his lab work is reviewed. (G 2)

Mr. Peeples was tested for COVID-19 on a half dozen occasions in 2021, mainly in connection with intra-facility transfers. He was cleared for transfer, and the test results were "Negative Asymptomatic." (*See* G 67; *see also* G 15, 18, 19, 20, 48, 56–58, 110; *cf,* G 99, 109 (reports of quarantines of asymptomatic person and ordering COVID screening).) A Quest Diagnostics report of NAAT testing, dated June 30, 2021, seems to be typical: "SARS CoV 2

---

[4]   A history of vital signs from January 2021 to January 2022 is at G 53. It is updated to June 3, 2022, at G2 14.

RNA NOT DETECTED." (G 89. *See also* G 91 (Quest lab report negative for COVID, May 6, 2021), G 113–114 (Quest lab report, negative for COVID, Jan. 6, 2021). Recently, on September 19, 2022, Mr. Peeples again tested negative for COVID-19. He again was noted to be "Asymptomatic." (G2 25)

No history of COVID-19 infection is noted. Throughout the medical records, the only entry under "Personal History of COVID-19" is a notation that he has been vaccinated. (*e.g.,* G2 20) (*See also* Section II.A.3, *infra* (history of vaccination).)

As of the filing of this motion, there was no medical evidence, or even apparently any complaint, of shortness of breath. Significantly, the October 2021 workup notes no complaint of "Shortness of Breath, Orthopnea, Paroxysmal Nocturnal Dyspnea, Palpitation, Syncope, Claudication." (G 5) Another health screen as of April 29, 2021, notes negative COVID-19 results and "No: Cough, Shortness of Breath, Fatigue, Body aches, Sore throat, Diarrhea, Headache, Loss of taste or smell, Nausea or vomiting."  At a health screen on May 25, 2021, Mr. Peeples "Denied" any respiratory problem. (G 21.)[5]

A summary of oxygen saturation ($SaO_2$) readings from January 2021 to October 2021 shows readings ranging from a low of 96% in June 2021 to a high of 100% in October 2021. (G 55.)

Updated medical records, obtained at the Court's request, reflect another physical exam on June 3, 2022, with results very similar to those of the October 2021 exam, described at p. 6, *supra.* (*See* G2, *passim.*) The chief difference is a new complaint of shortness of breath.[6] As noted above, there is

---

[5]   Chest pain is noted. As of October 8, 2021, X-rays showed projecting ballistic fragments at the posterior right lung base, the residue of an old gunshot wound. There was no radiographic evidence of an acute cardiopulmonary process, and no significant problems with the thoracic or lumbar spine. (G 93–96.) Mr. Peeples complained of back pain, but refused Cymbalta and took only Motrin. (G 97.)

[6]   I observe that Mr. Peeples's motion had been filed by then. Of course, if there were new medical evidence of COVID-19, the timing would be irrelevant. There is, however, no such medical evidence.

7

still no medical evidence of COVID-19 infection. Now, however, Mr. Peeples states that while he formerly could do "200 to 500 pushups without difficulty," he now "feels exhausted after 75 pushups," and also tires more easily after walking. (G2 6.)

On clinical examination, his lungs are clear. (G2 7.) His $SaO_2$ reading continues to be 100%. (G2 14.)

An echocardiogram report as of August 19, 2022, shows no more than mild negative findings. (G2 38.)

As of September 23, 2022, the updated medical records reflect a "medical trip return from pulmonology." (G2 2.) Pertinent findings include the following:

> ASSESSMENT:
>
> > No Significant Findings/No Apparent Distress
> >
> > Pt is a medical trip return from Pulmonology.
> >
> > Pt is AAOx3. Vitals are stable, and charted.
> >
> > Pt denies pain and denies any injury on this transport.
> >
> > Pts chart was reviewed for allergies: NKDA
> >
> > Pt arrives without paperwork. Escort and pt indicate the Pulmonologist intends to send a report later. Same will be expected through Medical Records.
> >
> > Pt having no complaints/concerns was released to the compound and walked out of Health Services in no apparent distress.

(G2 2.) Follow-up lab tests show ACE levels out of range, although high blood pressure is not noted. (G2 30.)

Despite regular medical testing and care, there is no medical corroboration for Mr. Peeples's self-diagnosis of "Long Haul Syndrome." Indeed, there is no medical evidence of a COVID-19 infection at all. He has been vaccinated. There is no medical corroboration for his complaints of shortness of breath from whatever cause. Even if credited, exertional limitations from 200 to 75 pushups do not suggest extraordinary circumstances meriting release from service of a sentence. There is no indication that Mr. Peeples's medical care needs are not being met at FCI Fort Dix.

### 2. Defendant's other medical risk factors

Aside from COVID-19 itself, Mr. Peeples points to obesity as a risk factor that exposes him to serious medical consequences from a COVID-19 infection (past or future).

Courts, including this one, have routinely looked to the Centers for Disease Control ("CDC") for guidance as to conditions that place a person at particular risk of serious consequences from a COVID-19 infection. *See People With Certain Medical Conditions*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated as of Sept. 2, 2022) (cited herein as "CDC List"). "Older adults," i.e., those over age 65, are far more likely than young persons to suffer serious consequences, and account for some 81% of COVID-19 deaths. *Id.* Certain listed medical conditions are also recognized as risk factors for serious consequences from a COVID-19 infection. *Id.*[7] By "serious consequences," the CDC mean hospitalization, intensive care, being placed on a ventilator, or death. *Id.*

I consider Mr. Peeples's health status in light of the CDC List and the medical evidence.

At age 42, he is not an "older adult," and will not be one at the time of his presumptive release date. *Obesity* does indeed appear on the CDC List as a risk factor. Being overweight (BMI $\geq$25), obese (BMI $\geq$30), or severely obese (BMI $\geq$40) "can make you more likely" to suffer severe consequences as a result of a COVID-19 infection. *See* CDC List. Mr. Peeples is 70" or 71" tall. (G11, G34.) As of October 1, 2021, he weighed 238 pounds, or 108 kilograms (G 4). That

---

[7] The list, in abbreviated form, consists of Cancer, Chronic kidney disease, Chronic liver disease, Chronic lung disease (including "Asthma, if it's moderate to severe"), Dementia, Diabetes, Down syndrome, Heart conditions (and "possibly high blood pressure (hypertension)"), HIV infection, Immunocompromised state, Mental health conditions, Overweight and obesity, Pregnancy, Sickle cell disease, Smoking, Solid organ or blood stem cell transplant, Stroke, Substance use disorders, and Tuberculosis. *Id.*

corresponds to a BMI of 33.2, in the lower half of the obese range, and far from severely obese. Beginning in February 2022, he has received counseling regarding proper diet and weight loss. (G 8, 64.) Indeed, his weight decreased from 248 lbs. to 238 lbs. in the period from June 14 to October 1, 2021, suggesting that imprisonment has not impaired his ability to address the condition. (G 54.) By June 3, 2022, his weight had declined another four pounds, to 234 pounds. (G2 8.) Otherwise, Mr. Peeples has reported fairly routine complaints and various forms of pain or discomfort, some of it as a result of a prior gunshot wound, but nothing on the CDC list of aggravating factors.

Even in unvaccinated persons, relief has generally been denied to non-elderly inmates based on a BMI in the 30-39 range alone.[8] It remains true,

---

[8] My own cases denying relief based on obesity in the >30 BMI range include *United States v. Matos*, No. CR 19-113 (KM), 2022 WL 702858, at *5 (D.N.J. Mar. 9, 2022) (citing cases of hypertension and obesity in both the pre-vaccination and vaccination era); *United States v. Darby*, No. CR 13-631 (KM), 2022 WL 1423089, at *4 n.5 (D.N.J. May 5, 2022) (citing cases involving multiple chronic conditions including hypertension and obesity); *United States v. Johnson*, No. CR 18-578-01 (KM), 2022 WL 901468, at *4 (D.N.J. Mar. 28, 2022) ("Even in the pre-vaccine era, "[m]ultiple courts in this District have denied compassionate release to inmates suffering from hypertension and obesity because this lower degree of risk does not establish extraordinary and compelling reasons to justify release on its own.")(citing *United States v. Manon*, No. CR 16-00460, 2022 WL 408958, at *3 D.N.J. Feb. 10, 2022).

The government cites numerous other examples: *United States v. Stewart*, No. 08-00346, 2021 WL 2134937, at *3 (D.N.J. May 25, 2021) (Wigenton, J.) ("Thus, even placing Defendant's vaccination status and COVID-19 history aside, it is not clear that Defendant's obesity amounts to an extraordinary and compelling reason for early release." (internal citations omitted)); *United States v. Irizzary*, No. 14-652-13, 2021 WL 735779, at *6 (E.D. Pa. Feb. 25, 2021) (BMI of 33.1 of 38-year-old); *United States v. Garcia*, Nos. 09-224-01. 11-468-03, 2021 WL 719763, at *4 (E.D. Pa. Feb. 23, 2021) (a BMI of 31.8 and a history of smoking ten years earlier); *United States v. Gonzalez*, No. 14-00015, 2021 WL 662496, at *2 (E.D. Pa. Feb. 19, 2021) (noting that "numerous courts in this Circuit have held that a BMI around or moderately above 35 is insufficient" to justify release); *United States v. Hilario*, No. 18-161, 2021 WL 322899, at *3 (E.D. Pa. Feb. 1, 2021) ("Given Defendant's relative youth (33 years old) and his lack of other risk factors, his mild obesity [BMI of 32.2] does not constitute an extraordinary and compelling reason for his release."); *United States v. Concepcion*, No. 02-488, 2021 WL 50852, at *7 (E.D. Pa. Jan. 6, 2021) (BMI of 32.2); *United States v. Aguilar*, No. 18-CR-00275-LHK, 2020 WL 6081779, at *4 (N.D. Cal. Oct. 15, 2020) (relief denied to 27-year-old with BMI of 37.5); *United States v. Edison*, No. 12-225,

however, that obesity, even in fairly mild form, may increase the risk of serious consequences from a COVID-19 infection, should that occur. I therefore consider the likelihood of serious consequences from a COVID-19 infection, whether ongoing or contracted in the future, particularly in vaccinated inmates.

### 3. Vaccination

The likelihood of any further serious consequences from a COVID-19 infection has been greatly reduced by the vaccination of Mr. Peeples and others at the prison.

Mr. Peeples's medical records disclose a history of COVID vaccinations and boosters:

> COVID-19 Moderna Vaccine 04/08/2021 Refused . . .
> COVID-19 Pfizer-BioNTech 05/26/2021 . . . Left Deltoid 0.3mL . . .
> COVID-19 Pfizer-BioNTech 06/17/2021  . . . Left Deltoid 0.3mL . . .
> COVID-19 Pfizer-BioNTech 04/08/2022 . . . Left Deltoid 0.3mL

(G 70, G2 26, 43.) Clearly the vaccines have been made available, and Mr. Peeples has wisely availed himself of them.

The available vaccines (Pfizer, Moderna, and Johnson & Johnson) have been shown to be highly effective at preventing infection. Just as important is that when people do experience breakthrough infections, they are "much less likely to experience severe symptoms than people who are unvaccinated." *See* The Possibility of COVID-19 after Vaccination: Breakthrough Infections, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html (last updated June 23, 2022). The wide availability of those vaccines tends to render the COVID-19 risk less extraordinary or compelling.

The rates are constantly changing, of course, but the CDC currently summarize certain of their effectiveness data as follows:

---

2020 WL 3871447, at *3 (D. Minn. July 9, 2020) (obesity alone (BMI of 35.4) "fails to meet the demanding standard for compassionate release.").

11

- **In July 2022, among people ages 50 years and older, unvaccinated people had: 12x Risk of Dying from COVID-19 compared to people vaccinated with a primary series and two or more booster doses.**
- **Among people ages 50 years and older, vaccinated people with a primary series and one booster dose had: 2x Risk of Dying from COVID-19 compared to people vaccinated with a primary series and two or more booster doses.**

https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (linking to underlying data). The CDC report the following data regarding hospitalizations, a proxy for severity:

> In August 2022, compared to people who are up to date with COVID-19 vaccination, monthly rates of COVID-19-associated hospitalizations were **5.2x Higher in Unvaccinated Adults Ages 18 Years and Older** . . .
>
> **3.5x** Higher in Unvaccinated Adults Ages 18-49 years
>
> **7.4x** Higher in Unvaccinated Adults Ages 50-64 years
>
> **5.4x** Higher in Unvaccinated Adults Ages 65 Years and Older

https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination.

There are no guarantees, and breakthrough infections are a reality. It also remains true that the virus develops new variants, requiring that scientific and medical conclusions be revised. Given the current effectiveness of vaccines, however, courts including this one have often found vaccination[9] to be highly relevant to the risks associated with COVID-19 infection. This holding of my experienced colleague Judge Kugler is illustrative:

> Further, as Defendant is fully vaccinated against COVID-19, . . . he is substantially protected from COVID-19 infection and, in the case of another breakthrough infection, from severe symptoms, *see United States v. Williams*, Crim. No. 11-00421-1, 2022 WL 950994, at *2 (D.N.J. Mar. 29, 2022) ("If a defendant is vaccinated, many courts have found that there is an insignificant

---

[9]   Or refusal to be vaccinated. *See, e.g., United States v. Thomas*, No. 21-1645, 2022 WL 296594, at *2 (3d Cir. Feb. 1, 2022); *United States v. Johnson,* Crim. No. 18-578, 2022 WL 901468 (D.N.J. May 20, 2022) (citing *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021)).

likelihood that the defendant 'will contract COVID-19 and become seriously ill.'" (citation omitted)) (collecting cases). The Third Circuit recently recognized in an unpublished decision that "[g]iven vaccine availability, a prisoner likely will not be able to prove that his personal risk of serious illness from COVID-19 is an extraordinary and compelling reason for release unless he can convincingly show that he is 'unable to receive or benefit from a vaccine' or that he 'remain[s] vulnerable to severe infection, notwithstanding the vaccine.'" *United States v. Estevez-Ulloa*, Crim. No. 21-2432, 2022 WL 1165771, at *2 (3d Cir. Apr. 20, 2022) (citing *United States v. Rucker*, 27 F.4th 560, 563 (7th Cir. 2022)).

*United States v. Bulaman*, No. CR 12-794 (RBK), 2022 WL 3913430, at *4 (D.N.J. Aug. 31, 2022).[10]

Finally, there is another, more general sense in which vaccination reduces the risk to Mr. Peeples. BOP has made the vaccine available to all inmates under its supervision; it has received 374,643 doses, and of that total it has administered over 331,515 doses systemwide. *See* https://www.bop.gov/coronavirus/. At FCI Fort Dix, 277 staff members and 3250 inmates have been fully inoculated. *Id.* (Click through to "individual facility stats.")[11] The resulting herd immunity benefits all inmates, including Mr. Peeples, and the current infection statistics at Fort Dix bear that out.

---

[10] Such holdings have spanned the initial, Delta and Omicron variant eras of this pandemic. *See also United States v. Gatson*, No. 21-2749, 2021 WL 5632079, at *1 n.1 (3d Cir. Dec. 1, 2021); *United States v. Battle,* No. 21-2151, 2021 WL 4550925, at *2 (3d Cir. Oct. 5, 2021); *United States v. v. Jerez Matos*, No. CR 19-113 (KM), 2022 WL 702858, at *3 (D.N.J. Mar. 9, 2022); *United States v. Turbides-Pena*, No. 17-339, 2021 WL 2310093, at *3 (D.N.J. June 7, 2021) (Chesler, J.) ("Given that Defendant is fully vaccinated against Covid-19, the risk of that illness due to continued incarceration has been substantially reduced and does not constitute an extraordinary and compelling reason for a reduction in sentence."); *United States v. Stewart*, No. 08-00346, 2021 WL 2134937, at *3 (D.N.J. May 25, 2021) (Wigenton, J.) (noting "with the vaccine's protection . . . Defendant's susceptibility to renewed serious illness seems unlikely"); *United States v. Shumate*, No. 18-0645 (NLH), 2021 WL 2374621, at *2 (D.N.J. June 9, 2021) (Hillman, J.) (citing cases and noting "it is appropriate for courts to consider the vaccination status of a defendant when considering compassionate release motions").

[11] FCI Fort Dix currently houses 3165 inmates. The vaccination figure, which exceeds that total, presumably reflects some turnover in the prison population.

13

### 4. Infection Rates at FCI Fort Dix

I next consider the current likelihood of Mr. Peeples's contracting COVID-19 as a result of being incarcerated at FCI Fort Dix. That likelihood is low. Clearly, many infections occurred, particularly in the earlier period of the pandemic, before vaccination was widely available.[12] By mid-2021, however, infection rates in the prison system trended downward, largely as a result of distancing procedures and vaccination.

FCI Fort Dix is a low security federal correctional institution with an adjacent minimum security satellite camp. Currently the facility houses a total of 3165 inmates: 2908 in the FCI, and 257 in the camp. *See* https://www.bop.gov/locations/institutions/ftd/index.jsp. Current and cumulative figures for COVID-19 infections at FCI Fort Dix are as follows:

| Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
| --- | --- | --- | --- | --- | --- |
| 1 | 5 | 2 | 0 | 1366 | 129 |

*See* https://www.bop.gov/coronavirus/.

The first two columns represent current figures; the last four are cumulative since the beginning of the pandemic in 2020. The "recovered" figures testify to an outbreak, substantial numbers of positive COVID test results among the inmates and staff, and, tragically, two inmate deaths. According to local news reports, the latter of those two deaths occurred some 18 months ago, on March 25, 2021. *See* https://www.burlingtoncountytimes.com/story/news/2021/04/07/2nd-inmate-fci-fort-dix-dies-covid-19-complications/7069721002/. Currently, the facility reports just one positive test among inmates, and five among staff. These current figures indicate no particular danger of infection, or serious consequences therefrom, that is higher inside FCI Fort Dix than it would be

---

[12] Mr. Peeples's briefs cite accounts of rapid spread of the disease in FCI Fort Dix and other prisons. Those references, however, largely date from an era when neither vaccines nor widespread testing were yet in place. *See, e.g., United States v. Brown*, No. 13-CF-176-1, 2020 WL 5801494 (E.D. Pa., Sept 29, 2020); *United States v. Mongelli*, No. 02-CR-307, 2020 WL 6449237 (E.D. N.Y. Nov 3, 2020).

outside. Indeed, while a rigorous comparison is not practicable, available statistics tend to suggest the opposite.[13]

\* \* \*

In short, there is no persuasive evidence that Mr. Peeples's risk of contracting and suffering serious consequences from a COVID-19 infection would be reduced by his release. Mr. Peeples's personal medical situation, whether taken in isolation or in the context of conditions at FCI Fort Dix, does not support a finding of compelling and exceptional circumstances.

### B. § 3553(a) factors

Even if the circumstances were extraordinary, consideration of the sentencing factors under 18 U.S.C. § 3553(a) would weigh against an order of release. *See generally United States v. Doe,* 833 F. App'x 366 (3d Cir. 2020). Because the circumstances are not extraordinary, however, I consider the § 3553(a) factors only briefly.

The offenses of conviction are serious ones. Mr. Peeples pled guilty to being a felon in possession of two firearms, one of them stolen and with a large capacity magazine, and to possession with intent to distribute narcotics.

His history and characteristics include three prior felony narcotics convictions and a criminal history category of VI. Those are not outweighed by the hardships of his early life or the recent death of his aunt.

The need for punishment, deterrence, and a sentence reflecting the

---

[13] The demographics of FCI Fort Dix are surely not comparable to those of the State of New Jersey; the age, health, and racial mix of the two populations, for example, very likely vary. A comparison of mortality rates is nevertheless suggestive. Fort Dix has experienced 2 deaths out of a population of 3165 (not counting turnover), for a rate of .06%. I do not view these sad deaths from a statistical, Strangelovian point of view; they happened to individual human beings. Nevertheless, I must note that the State of New Jersey has experienced a COVID mortality rate that is six times higher: 34,118 deaths out of a population of nearly 9.4 million, for a rate of .36%. *See* https://covid19.nj.gov/#live-updates. Burlington County, where Fort Dix is located, has experienced a COVID death rate four times higher than that of the prison: 281 per 100,000, or .28%. *Id.* As I pointed out at the beginning of this discussion, p. 5, *supra*, the COVID pandemic affects us all, and a person's health condition tends to persist in or out of prison; the issue on this motion is whether *incarceration* unacceptably magnifies a risk to the defendant that would be alleviated by his release.

15

seriousness of the offense were clear at the time of sentencing, and remain so. Prior punishments apparently failed of their deterrent effect. That said, his completion of a GED program, positive disciplinary record, contribution to the UNICOR program, and other rehabilitative efforts do weigh in his favor.

The sentence was proportionate and not disparate from those of other, similarly situated defendants. It was at the bottom of the 151-188 month range dictated by the offense level of 29 that was stipulated to in the plea agreement. The parties disagree as to the percentage of sentence that has been served, but even accepting Mr. Peeples's figure of approximately 60% (updated to the current date), he still has a very substantial portion left to serve, and that undischarged debt to society weighs against release.[14] Release at the present time, even if the circumstances were compelling, which they are not, *see* Section II.A, *supra*, would tend to undercut the goals of sentencing as set forth in § 3553(a).[15]

## ORDER

**IT IS THEREFORE** this 17th day of October, 2022,

**ORDERED** that the motion for compassionate release (DE 36) is **DENIED**. The clerk shall send a copy of this opinion and order to the defendant/petitioner, Myson Peeples, by regular first-class mail, and close the file.

/s/ Kevin McNulty
_____
**KEVIN MCNULTY, U.S.D.J.**

---

[14] There was a dispute over the extent of federal credit for certain periods of custody, which may still be unresolved. Such issues are properly pursued administratively in the BOP system in the first instance, and thereafter *via* a habeas petition in the district of incarceration.

[15] I note for completeness that the alternative relief of transfer to home confinement is unavailable. The Court has no authority to grant such relief, which is reserved to the BOP under 18 U.S.C. § 3624(c)(2). *See United States v. Voda*, 994 F.2d 149, 151–52 (5th Cir. 1993); *Aigebkaen v. Warden*, No. 20-5732, 2020 WL 6883438, at *4 (D.N.J. Nov. 24, 2020) ("Pre-release placement decisions, such as transfers to home confinement, are committed to the BOP's sole discretion."). If the court did possess the discretion to award such relief, it would not do so, for the reasons expressed above.

16